**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GARY VARJABEDIAN,
　　　　　　　*Plaintiff-Appellant*,

　　　　　　v.

EMULEX CORPORATION; BRUCE C.
EDWARDS; JEFFREY W. BENCK;
GREGORY S. CLARK; GARY J.
DAICHENDT; PAUL F. FOLINO;
BEATRIZ V. INFANTE; JOHN A.
KELLEY; RAHUL N. MERCHANT;
NERSI NAZARI; DEAN A. YOOST;
AVAGO TECHNOLOGIES WIRELESS
(USA) MANUFACTURING, INC.;
EMERALD MERGER SUB, INC.,
　　　　　　　*Defendants-Appellees.*

No. 16-55088

D.C. No.
8:15-cv-00554-
CJC-JCG

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted October 5, 2017
Pasadena, California

Filed April 20, 2018

Before: Susan P. Graber, Mary H. Murguia,
and Morgan Christen, Circuit Judges.

Opinion by Judge Murguia;
Concurrence by Judge Christen

## SUMMARY[*]

### Securities

The panel affirmed in part and reversed in part the district court's dismissal of a putative securities class action complaint arising from a corporate merger.

Reversing in part, and disagreeing with five other circuits, the panel held that intervening guidance from the Supreme Court compelled the conclusion that claims under Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), require a showing of negligence, rather than scienter.

The panel affirmed the district court's (1) conclusion that Section 14(d)(4) of the Exchange Act does not create a private right of action for shareholders confronted with a tender offer and (2) dismissal of the complaint as to one defendant because it was not a proper defendant.

Because plaintiff's Section 14(e) claim survived, his claim under Section 20(a) of the Exchange Act also remained. The panel remanded for the district court to reconsider defendants' motion to dismiss under a negligence standard.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring, Judge Christen wrote that she fully concurred in the panel's decision. She wrote separately to explain why the Supreme Court's holdings in *Ernst & Ersnt v. Hochfelder*, 425 U.S. 185 (1976), and *Aaron v. Sec. & Exchange Comm'n*, 446 U.S. 680 (1980), persuaded her to depart from other circuits' interpretation of Section 14(e).

---

## COUNSEL

Juan E. Monteverde (argued), Monteverde & Associates PC, New York, New York; Barbara A. Rohr, Faruqi & Faruqi LLP, Los Angeles, California; for Plaintiff-Appellant.

Eric N. Landau (argued), and Travis Biffar, Jones Day, Irvine, California; Erica L. Reilley, Jones Day, Los Angeles, California; for Defendants-Appellees Emulex Corporation, Bruce C. Edwards, Jeffrey W. Benck, Gregory S. Clark, Gary J. Daichendt, Paul F. Folino, Beatriz V. Infante, John A. Kelley, Rahul N. Merchant, Nersi Nazari, and Dean A. Yoost.

Matthew Rawlinson (argued) and Hilary Mattis, Latham & Watkins LLP, Menlo Park, California; for Defendants-Appellees Avago Technologies Wireless (USA) Manufacturing, Inc.; Emerald Merger Sub, Inc.

## OPINION

MURGUIA, Circuit Judge:

Plaintiff-Appellant Jerry Mutza[1] ("Plaintiff") appeals the district court's dismissal of his putative securities class action complaint, brought on behalf of former Emulex Corporation shareholders. The district court dismissed Plaintiff's complaint because he failed to plead a strong inference of scienter for Defendants' alleged violations of Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e) ("Exchange Act"). In so concluding, the district court followed out-of-circuit authorities holding that Section 14(e) claims require proof of scienter. The district court noted, however, that the Ninth Circuit had yet to decide whether Section 14(e) claims require plaintiffs to plead that defendants acted with scienter. We now hold that Section 14(e) of the Exchange Act requires a showing of negligence, not scienter. Accordingly, we reverse the dismissal of the complaint and remand the case to the district court for it to reconsider Defendants' motion to dismiss under a negligence standard.

Moreover, because Plaintiff's Section 14(e) claim survives, his claim under Section 20(a) of the Exchange Act also remains. Further, for the reasons detailed below, we affirm the district court's (1) conclusion that Section

---

[1] Although Gary Varjabedian filed the initial complaint and the notice of appeal, the district court appointed Jerry Mutza as Lead Plaintiff in this case. Indeed, both Plaintiff-Appellant's opening brief and the answering brief identify Jerry Mutza as the court-appointed Lead Plaintiff in this action. The case caption, however, reflects Varjabedian as Plaintiff. There is no material difference between Mutza and Varjabedian for purposes of this appeal, as they both represent the same class of Emulex shareholders and are represented by the same counsel.

14(d)(4) of the Exchange Act does not create a private right of action and (2) dismissal of the complaint as to Emerald Merger Sub, Inc. because it is not a proper defendant.

## I. BACKGROUND

This case centers on the merger between Emulex Corp. ("Emulex") and Avago Technologies Wireless Manufacturing, Inc. ("Avago"). Emulex was a Delaware-incorporated technology company that sold storage adapters, network interface cards, and other products. On February 25, 2015, Emulex and Avago issued a joint press release announcing that they had entered into a merger agreement, with Avago offering to pay $8.00 for every share of outstanding Emulex stock. The $8.00 price reflected a premium of 26.4% on Emulex's stock price the day before the merger was announced.

Pursuant to the terms of the announced merger agreement, a subsidiary of Avago, Emerald Merger Sub, Inc. ("Merger Sub"), initiated a tender offer for Emulex's outstanding stock on April 7, 2015. A tender offer is a technique whereby the offeror, Avago, seeks to obtain control of a target corporation, here Emulex, by publicly offering to purchase a specified amount of the target company's stock. *See* Arthur Fleisher, Jr. & Robert H. Mundheim, *Corporate Acquisition by Tender Offer*, 115 U. Pa. L. Rev. 317, 317 (1967). The offeror requests the stockholders of the target corporation "tender" their shares, at a fixed price, customarily in excess of the current market value, in order to gain control of the target company. *Id.*; *see also Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 22 (1977). When a tender offer is made, the target company often issues a statement to its shareholders recommending that they either accept or reject the tender offer. Emulex decided to issue such a statement but, before doing so, hired Goldman

Sachs to determine whether the proposed merger agreement would be fair to shareholders. Goldman Sachs determined that the agreement would be fair to shareholders and provided Emulex with financial analyses supporting Goldman Sachs's position. Based in part on Goldman Sachs's opinion, Emulex filed a 48-page Recommendation Statement with the Securities and Exchange Commission ("SEC") pursuant to 17 C.F.R. § 240.14d-101 Schedule 14D-9.

The Recommendation Statement supported the tender offer and recommended that shareholders tender their shares. It listed nine reasons for the recommendation: (1) the value shareholders would receive in the merger "was greater than could be reasonably expected" in the future if they continued to hold Emulex stock; (2) other available alternatives and transactions were less favorable; (3) Emulex shareholders would receive a premium on their stock; (4) Goldman Sachs found that the merger was fair; (5) the cash consideration shareholders would receive was certain; (6) the agreement provided that Emulex could back out if it received a better offer before closing; (7) the agreement permitted Emulex to modify its recommendation; (8) a termination fee built into the merger agreement would not preclude subsequent third-party offers for Emulex; and (9) closing conditions were appropriate.

The Recommendation Statement in support of the tender offer also included a summary of Goldman Sachs's fairness opinion. The summary describes in some detail the processes Goldman Sachs followed when rendering its opinion. The Recommendation Statement also highlights four particular financial analyses—the Historical Stock Trading Analysis, the Selected Companies Analysis, the Illustrative Present Value of Future Share Price Analysis, and the Illustrative

Discounted Cash Flow Analysis—that supported Goldman Sachs's fairness opinion. These analyses looked at different metrics of Emulex's past, present, and expected financial performance to help Goldman Sachs develop its fairness opinion.

Goldman Sachs also produced a one-page chart titled "Selected Semiconductor Transactions," alternatively referred to as the "Premium Analysis." The Premium Analysis selected certain transactions in the industry that Goldman Sachs deemed most similar to the proposed merger between Avago and Emulex, and reviewed the respective premiums stockholders received in those transactions. Altogether, the Premium Analysis collected seventeen transactions involving a semiconductor company between 2010 and 2014. Emulex's 26.4% premium fell within the normal range of semiconductor merger premiums listed in the Premium Analysis, but it was below average. Goldman Sachs opined that the merger was fair despite a below-average premium, and Emulex elected not to summarize the one-page Premium Analysis in the Recommendation Statement. Enough Emulex shareholders ultimately accepted the tender offer to consummate the merger. On May 5, 2015, Merger Sub merged into Emulex, with Emulex surviving as a wholly-owned subsidiary of Avago.

Not all the shareholders, however, were happy with the merger's terms. Some believed the $8.00-per-share price offered was inadequate given Emulex's significant growth leading up to the tender offer and the company's prospects for future growth. This class of shareholders, who claimed they were misled by Emulex, Avago, Merger Sub, and the Emulex Board of Directors (collectively, "Defendants") into believing that the merger was better than it actually was, brought a lawsuit against Defendants. The district court

eventually named Mutza Lead Plaintiff. Plaintiff alleges that Defendants violated federal securities laws, specifically Section 14(e) of the Exchange Act, by failing to summarize the Premium Analysis in the Recommendation Statement, which would have disclosed that the 26.4% premium was below average compared to similar mergers. Plaintiff also sought to hold the directors of Emulex vicariously liable as "controlling persons" under Section 20(a) of the Exchange Act.

The district court dismissed the complaint with prejudice. In deciding to do so, the district court concluded that Section 14(e) requires a showing of scienter and that Plaintiff failed to plead scienter. Next, the district court rejected Plaintiff's separate claim under Section 14(d), concluding that Section 14(d)(4) does not establish a private right of action for shareholders confronted with a tender offer. Finally, the court dismissed the Section 20(a) claim because Plaintiff did not adequately plead a claim under Section 14(d) or (e).[2] Plaintiff timely appeals.

## II.  STANDARD OF REVIEW

We review *de novo* a district court's decision to grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). We also review *de novo* questions of statutory interpretation. *Millard v. United Student Aid Funds, Inc.*, 66 F.3d 252, 253 (9th Cir. 1995). Because Plaintiff argues

---

[2] Claims under Section 20(a) necessarily rise and fall with the other securities claims. To prevail on a Section 20(a) claim, "a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section [14(e)], and then show that the defendant exercised actual power over the primary violator." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).

that Section 14(e) of the Exchange Act requires Plaintiff to show Defendants were negligent by not including the Premium Analysis in the Recommendation Statement—not that Defendants intentionally excluded the Premium Analysis to mislead shareholders—this case requires us to interpret Section 14(e).

## III.  DISCUSSION

### A.  Section 14(e) Claim

#### 1.  Federal Securities Law Background

The Exchange Act of 1934, codified at 15 U.S.C. §§ 78a–78qq, is one of two major federal securities statutes Congress enacted in the wake of the Great Depression. The other statute is the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa. The Exchange Act and the Securities Act of 1933 differ in purpose and scope. "The general purpose of the Securities Act [of 1933] is to regulate the initial distribution of securities by issuers to public investors. . . . The Exchange Act [of 1934] provides for the regulation of the securities exchange markets and the operations of the corporations listed on the various national securities exchanges." Elisabeth Keller & Gregory A. Gehlmann, *Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934*, 49 Ohio St. L.J. 329, 330 (1988). In other words, the Securities Act of 1933 governs initial public offerings ("IPOs") while the Exchange Act, at issue here, regulates all subsequent securities transactions (*e.g.*, sales on the open market, proxy solicitations, tender offers).

Section 14(e) was not part of the original Exchange Act enacted in 1934. Rather, Congress added Section 14(e) as an amendment to the Securities Exchange Act as part of the

Williams Act. *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 8 (1985). The purpose of Section 14(e) is to regulate the conduct of a broad range of people who could influence the outcome of a tender offer. *Piper*, 430 U.S. at 24. To that end, Section 14(e) "was expressly directed at the conduct of a broad range of persons, including those engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer." *Id.*

> **2. Whether Section 14(e) requires Plaintiff to show Defendants knew their actions were wrong or only that they were negligent.**

The main question here is whether Section 14(e) requires proof of scienter, as the district court held, or mere negligence. "Statutory interpretation begins with the plain language of the statute." *United States v. Johnson*, 680 F.3d 1140, 1144 (9th Cir. 2012) (internal quotation marks omitted). A plain reading of Section 14(e) readily divides the section into two clauses, each proscribing different conduct:

> It shall be unlawful for any person [1] to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, *or* [2] to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . .

15 U.S.C. § 78n(e) (emphasis added). The use of the word "or" separating the two clauses in Section 14(e) shows that there are two different offenses that the statute proscribes; to construe the statute otherwise would render it "hopelessly

redundant" and would mean "one or the other phrase is surplusage." *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1976).

In concluding that claims under Section 14(e) require allegations of scienter, the district court stated: "Considering the wealth of persuasive case law to the contrary, the Court concludes that the better view is that the similarities between Rule 10b-5 and § 14(e) require a plaintiff bringing a cause of action under § 14(e) to allege scienter."[3] The district court relied on decisions from five other circuits holding that Section 14(e) claims require alleging scienter. *See, e.g.*, *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009); *In re Digital Island Sec. Litig.*, 357 F.3d 322, 328 (3d Cir. 2004); *SEC v. Ginsburg*, 362 F.3d 1292, 1297 (11th Cir. 2004); *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961 (2d Cir. 1987); *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 431 (6th Cir. 1980). However, we are persuaded that the rationale underpinning those decisions does not apply to Section 14(e) of the Exchange Act. At their core, the decisions from these five circuits rest on the shared text found in both Rule 10b-5 and Section 14(e). Yet important distinctions exist between Rule 10b-5 and Section 14(e)—distinctions that strongly militate against importing the scienter requirement from the context of Rule 10b-5 to Section 14(e).

---

[3] Rule 10b-5 is an SEC regulation promulgated under Section 10(b) of the Exchange Act. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 889–990 (9th Cir. 2009). The rule provides that "'[i]t shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'" *Id.* (citing 17 C.F.R. § 240.10b-5(c)).

The first of the other circuits' decisions came in 1973, a few years after Section 14(e) was enacted, when the Second Circuit held that Section 14(e) requires a showing of scienter: "[W]e shall follow the principles developed under Rule 10b-5 regarding the elements of [Section 14(e)] violations." *Chris-Craft Indus. Inc., v. Piper Aircraft Corp.*, 480 F.2d 341, 362 (2d Cir. 1973).

One year after *Chris-Craft*, the Fifth Circuit followed suit and held, "[w]e are in accord with the Second Circuit that the same elements must be proved to establish a violation of either [Section 14(e)] or [Rule 10b-5]." *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 605 (5th Cir. 1974) (citing *Chris-Craft*, 480 F.2d at 362). Those two circuits arrived at the conclusion that Rule 10b-5 required a showing of scienter.

Then, in 1976, the Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976), held that claims under Section 10(b) of the Exchange Act and Rule 10b-5 must allege scienter. Importantly, as it relates to this case, the Supreme Court's reasoning in reaching that decision casts doubt on the rationale of *Chris-Craft* and *Smallwood.* The Court in *Ernst & Ernst* began with the text of Rule 10b-5(b), which states: "It shall be unlawful . . . [t]o make any untrue statement of a material fact or omit to state any material fact . . . ." *Ernst & Ernst*, 425 U.S. at 195–96. Addressing that phrase, the Court noted, "[v]iewed in isolation the language of [Rule 10b-5(b)] . . . could be read as proscribing, respectively, *any type* of material misstatement or omission . . . *whether the wrongdoing was intentional or not*." *Ernst & Ernst*, 425 U.S. at 212 (emphases added). In other words, the Court acknowledged that the wording of Rule 10b-5(b) could reasonably be read as imposing a scienter *or a negligence* standard. This means that Rule 10b-5(b)'s text,

and by extension the identical phrasing in the first clause of Section 14(e), did not necessarily compel finding a scienter requirement. *Compare* 17 C.F.R. § 240.10b-5(b), *with* 15 U.S.C. § 78n(e).

The Court in *Ernst & Ernst* nevertheless went on to conclude that Rule 10b-5(b) requires a showing of scienter because of the relationship between Rule 10b-5 and its authorizing legislation, Section 10(b) of the Exchange Act. Significantly, the Court's conclusion that scienter is an element of Rule 10b-5(b) had nothing to do with the text of Rule 10b-5. As the Court explained:

> Rule 10b-5 was adopted pursuant to authority grand [*sic*] the [SEC] under § 10(b) . . . . [The scope of Rule 10b-5] cannot exceed the power granted the [SEC] by Congress under § 10(b). . . . *[W]e think the [SEC's] original interpretation of Rule 10b-5 was compelled by the language and history of § 10(b) . . . .* When a statute speaks so specifically in terms of manipulation and deception, and of implementing devices and contrivances—the commonly understood terminology of intentional wrongdoing—and when its history reflects no more expansive intent, we are quite unwilling to extend the scope of the statute to negligent conduct.

*Ernst & Ernst*, 425 U.S. at 212–14 (emphasis added). Put simply, Rule 10b-5 requires a showing of scienter because it is a regulation promulgated under Section 10(b) of the Exchange Act, which allows the SEC to regulate *only* "manipulative or deceptive device[s]." 15 U.S.C. § 78j(b).

This rationale regarding Rule 10b-5 does not apply to Section 14(e), which is a statute, not an SEC Rule.

Later in 1980, the Supreme Court provided useful guidance for interpreting the first clause of Section 14(e) of the Exchange Act in *Aaron v. SEC*, 446 U.S. 680 (1980). The securities provision at issue in *Aaron*—Section 17(a)(2) of the Securities Act of 1933—and the first clause of Section 14(e), contain nearly identical wording. Both sections prohibit "any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading."[4] *Compare* 15 U.S.C. § 77q(a)(2), *with* 15 U.S.C. § 78n(e). Importantly, the Court in *Aaron* held that Section 17(a)(2) does *not* require a showing of scienter. *Aaron*, 446 U.S. at 696–97.

Although Section 17(a)(2) appears in the Securities Act of 1933, while Section 14(e) appears in the Exchange Act, "statutes dealing with similar subjects should be interpreted harmoniously." *Jonah R. v. Carmona*, 446 F.3d 1000, 1007 (9th Cir. 2006) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 738–39 (1989) (Scalia, J., concurring)). Beyond their nearly identical text, Section 14(e) and Section 17(a) serve similar purposes. Both provisions govern disclosures and statements made in connection with an offer of securities, albeit in different contexts: Section 17(a) applies

---

[4] Section 17(a)(2) contains additional language that is missing from the first clause of Section 14(e). Specifically, the phrase "to obtain money or property by means of," appears in Section 17(a)(2) but not in Section 14(e). This phrase did not factor into the Supreme Court's analysis, and there is no meaningful discussion of the significance of these words in *Aaron*. Instead, the words that were outcome determinative are the same words appearing in both provisions: "by means of any untrue statement of a material fact or any omission to state a material fact." *Aaron*, 446 U.S at 696.

to initial public offerings while Section 14(e) applies to tender offers. *Chris-Craft*, 480 F.2d at 359 ("The Williams Act of 1968, of which § 14(e) is a part, was enacted to . . . require tender offer disclosures *similar to those required for issuance of new securities*." (emphasis added)).

Accordingly, both *Ernst & Ernst* and *Aaron* cast doubt on the underlying rationale of *Chris-Craft* and *Smallwood*. *Ernst & Ernst* provides that the scienter requirement is rooted not in the text of Rule 10b-5, but rather in the relationship between Rule 10b-5 and its authorizing legislation. *Ernst & Ernst*, 425 U.S. at 212–14. *Aaron* took a further step by holding that the plain language of Section 17(a)(2), which is largely identical to the first clause of Section 14(e), requires a showing of negligence, not scienter. *Aaron*, 446 U.S. at 696–97. In so doing, *Aaron* rejected the Second Circuit's rationale for holding that a negligence standard does not apply to claims under Section 17(a).[5]

Despite the Supreme Court's decisions in *Ernst & Ernst* and *Aaron*, circuit courts have continued to adopt the reasoning in *Chris-Craft* and *Smallwood*. For instance, in 1987, the Second Circuit cited *Chris-Craft*, holding that "[i]t is well settled in this Circuit that scienter is a necessary element of a claim for damages under § 14(e) of the Williams Act." *Conn. Nat'l Bank*, 808 F.2d at 961. Likewise, as recently as 2009, the Fifth Circuit cited *Smallwood* for the proposition that "[t]he elements of a claim under Section 14(e), which applies to tender offers, are identical to the

---

[5] In *Chris-Craft*, the Second Circuit rejected the argument that Section 17(a) imposes a mere negligence standard. 480 F.2d at 363 ("We have indicated, however, that mere negligent conduct is not sufficient to permit plaintiffs to recover damages in a private action under § 17(a) or § 10(b)." (internal quotation marks omitted)).

Section 10(b)/Rule 10b-5 elements." *Flaherty*, 565 F.3d at 207. Similarly, in 2004, the Third Circuit cited *Smallwood* and held, "[w]e therefore join those circuits that hold that scienter is an element of a Section 14(e) claim." *Digital Island*, 357 F.3d at 328.

The two other circuits to reach this conclusion also do not account for the distinction between Rule 10b-5 and Section 14(e). The Sixth Circuit, for instance, concluded that Section 14(e) requires scienter because "Congress used the words 'fraudulent,' 'deceptive,' and 'manipulative.'" *Adams*, 623 F.2d at 431. The Sixth Circuit does not appear to have considered that the *first* clause of Section 14(e) does not contain any of those words. In fact, the *Adams* decision predated the *Aaron* decision by a month, so the Sixth Circuit did not have the benefit of the Supreme Court's decision in *Aaron* holding that the language of Section 17(a)(2), and by extension the language of the first clause of Section 14(e), requires only a showing of negligence.

Lastly, the Eleventh Circuit appears to have concluded, for the first time in 2004, that Section 14(e) requires scienter, but it seems to have relied on the common wording in Rule 10b-5 and Section 14(e). *See Ginsburg*, 362 F.3d. at 1297–98. Although the court cited to *SEC v. Adler*, 137 F.3d 1325, 1340 (11th Cir. 1998), to support the proposition that Section 14(e) claims require a showing of scienter, *Adler* does not analyze or discuss Section 14(e). Accordingly, it seems that *Ginsburg* too relied on the common wording of Rule 10b-5 and Section 14(e) for its holding that Section 14(e) claims require scienter. With the benefit of *Ernst & Ernst* and *Aaron*, the most compelling argument is that the first clause of Section 14(e) requires a showing of negligence, not scienter.

Moreover, Section 14(e) differs fundamentally from Section 10(b) because, under Section 14(e), the SEC is authorized to regulate a broader array of conduct than under Section 10(b). "[U]nder § 14(e), the [SEC] may prohibit acts not themselves fraudulent under the common law or § 10(b), if the prohibition is 'reasonably designed to prevent . . . acts and practices [that] are fraudulent.'" *United States v. O'Hagan*, 521 U.S. 642, 673 (1997) (alterations in original) (quoting 15 U.S.C. § 78n(e)). "This authority derives from the prophylactic rule-making power granted to the SEC by Section 14(e), *a power that has no parallel in Section 10(b).*" *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1005 (9th Cir. 2002) (emphasis added). If the SEC can prohibit "acts themselves not fraudulent" under Section 14(e), then it would be somewhat inconsistent to conclude that Section 14(e) itself reaches only fraudulent conduct requiring scienter.

The conclusion that Section 14(e) requires a showing of negligence, as opposed to scienter, also finds some support in the legislative history and purpose of the Williams Act. The Senate Report that accompanied Section 14(e) states: "This provision would affirm the fact that persons engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer are under an obligation to make full disclosure of material information to those with whom they deal." S. Rep. No. 510, 90th Cong., 2d Sess. (1968). Moreover, the Supreme Court has noted, "[t]he purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975). The legislative history suggests that the Williams Act places more emphasis on the quality of information shareholders receive in a tender offer

than on the state of mind harbored by those issuing a tender offer. Such a purpose supports a negligence standard.

Ultimately, because the text of the first clause of Section 14(e) is devoid of any suggestion that scienter is required, we conclude that the first clause of Section 14(e) requires a showing of only negligence, not scienter.

## B. Omission of a material fact

The district court did not reach the question whether omitting the Premium Analysis—a one-page chart containing seventeen transactions involving semiconductor companies—from the Recommendation Statement constitutes omission of a material fact in the context of the entire transaction, and we will not reach the question. Although it is difficult to show that this omitted information was indeed material, we remand for the district court to consider the question in the first instance. *See Zucco Partners*, 552 F.3d at 991 ("[T]he plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." (internal quotation marks omitted)).

## C. Section 14(d)(4) claim

The parties contest whether Section 14(d)(4) of the Exchange Act provides an implied right of action. The statute provides that "[a]ny solicitation or recommendation to the holders of . . . a security to accept or reject a tender offer . . . shall be made in accordance with [SEC] rules and regulations." 15 U.S.C. § 78n(d)(4). One such regulation, Rule 14d-9, states that a recommendation statement must

include "information required by Items 1 through 8 of Schedule 14D-9 or a fair and adequate summary thereof." 17 C.F.R. § 240.14d-9(d). In addition, Item 8 on Schedule 14D-9 requires a company's directors to furnish "information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading." 17 C.F.R. § 240.14d-101; 17 C.F.R. § 229.1011(c). Simply put, Section 14(d)(4) imposes an obligation on a company's directors to provide material information if such information is necessary to ensure that other required disclosures are not materially misleading.

The test for determining whether a federal statute creates an implied right of action was set forth in *Cort v. Ash* and entails four questions:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law . . . ?

422 U.S. 66, 78 (1975) (citations and internal quotation marks omitted). The fourth factor—the relationship with state law—is not relevant here. After analyzing this claim under the *Cort* factors, the district court concluded that

Section 14(d)(4) does not create a private right of action and dismissed this claim.

After reviewing the factors outlined in *Cort*, we agree with the district court. The first factor weighs against finding an implied right of action because the statute's focus is on the person regulated, those who issue "[a]ny solicitation or recommendation to . . . accept or reject a tender offer." 15 U.S.C. § 78n(d)(4); *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." (internal quotation marks omitted)).

Next, considering the second factor, there is no indication of any legislative intent to provide for a private right of action. Section 14(d)(4) is a generic statute simply requiring that recommendation statements abide by the SEC's rules.

> Finally, turning to the third factor, it would be inconsistent with the legislative scheme of the Williams Act to imply a remedy under Section 14(d)(4). It is undisputed that Section 14(e) provides for a private right of action to challenge alleged misrepresentations or omissions in connection with a tender offer. The question, then, is whether Congress intended to imply a private right of action under Section 14(d)(4) as an alternative to Section 14(e). However, holding that Section 14(d)(4) provides an implied right of action would be redundant and potentially cause tension with Section 14(e).

Accordingly, we affirm the district court's conclusion that Section 14(d)(4) does not create an implied right of action.

### D.  Section 20(a) claim

As stated above, claims under Section 20(a) of the Exchange Act necessarily depend on Plaintiff's Section 14(d)(4) and (e) claims. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014). Because Plaintiff's Section 14(d)(4) claim fails, but Plaintiff's Section 14(e) claim remains, the Section 20(a) claim also survives for the district court to consider on remand.

### E.  Merger Sub Defendant

Finally, we affirm the district court's dismissal of Merger Sub as a Defendant in this case. The Federal Rules of Civil Procedure are clear that a corporation's capacity to be sued is determined "by the law under which it was organized." Fed. R. Civ. P. 17(b)(2). As a Delaware corporation, Merger Sub Corporation ceased to exist after the merger was consummated, and its rights and liabilities now belong to the surviving corporation, Emulex. *See* 8 Del. C. § 259.

## IV.  CONCLUSION

We are aware that our holding today parts ways from our colleagues in five other circuits. However, for the reasons discussed above, we are persuaded that intervening guidance from the Supreme Court compels the conclusion that Section 14(e) of the Exchange Act imposes a negligence standard. Accordingly, we **REVERSE** the district court's decision as to the Section 14(e) claim because the district court employed a scienter standard in analyzing the Section 14(e) claim. We also **REMAND** for the district court to reconsider

Defendant's motion to dismiss under a negligence standard. On remand, the district court shall also consider whether the Premium Analysis was material, an argument that Defendants raised but that the district court did not reach. In addition, the district court shall consider Plaintiff's Section 20(a) claim since the Section 14(e) claim survives. We also **AFFIRM** the district court's conclusion that Section 14(d)(4) does not create an implied right of action. Finally, we **AFFIRM** the district court's dismissal of Merger Sub because it is not a proper Defendant.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**. The parties shall bear their own costs on appeal.

CHRISTEN, Circuit Judge, concurring:

I fully concur in today's decision and write separately only to explain why Supreme Court case law persuades me to depart from the interpretations of § 14(e) announced by several other circuits. By my read, in considering what degree of culpability § 14(e) requires, these courts have not addressed the ramifications of the Supreme Court's holdings in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), and *Aaron v. Securities & Exchange Commission*, 446 U.S. 680 (1980). I conclude that the decision we reach today is a faithful application of these Supreme Court cases.

The Second Circuit was among the first to consider the showing required to establish a § 14(e) violation. In *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1973), the court observed that the language of

§ 14(e) is virtually identical to that of Rule 10b-5.[1]  *Id.* at 362.  The court reasoned that § 14(e) must therefore require scienter, the same degree of culpability required by Rule 10b-5, citing its earlier decision in *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968).  In that case, the Second Circuit reviewed other sections of the Securities Exchange Act of 1934, but not Rule 10b-5's enabling statute.  *Id.* at 854–55.  A year later, the Fifth Circuit agreed with the Second Circuit's *Chris-Craft* decision, that "the same elements must be proved to establish a violation of either Section [14(e)] or . . . Rule [10b-5]."  *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 605 (5th Cir. 1974) (citing *Chris-Craft Indust., Inc.*, 480 F.2d at 362).

In 1976, the Supreme Court also agreed that Rule 10b-5 requires a showing of scienter, but it reached this conclusion for a different reason.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).  *Ernst & Ernst* observed that Rule 10b-5's authorizing statute, § 10(b), prohibited "any *manipulative or deceptive device or contrivance* in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe."  425 U.S. at 187–88 (emphasis added).  Because this statutory language "strongly suggest[s]" that Congress intended § 10(b) to prohibit only knowing or intentional misconduct, *id.* at 197, the Court concluded that the scope of Rule 10b-5 cannot exceed the threshold Congress established when it adopted § 10(b).  *Id.*

---

[1]  Both § 14(e) and Rule 10b-5 prohibit "mak[ing] any untrue statement of a material fact [or omitting to state a material fact] necessary in order to make the statements . . ., in the light of the circumstances under which they [were] made, not misleading."  Both § 14(e) and Rule 10b-5 also prohibit fraudulent or intentionally deceptive acts.  *See* 15 U.S.C. § 78n(e); 17 C.F.R. § 240.10b-5(a).

at 214. Importantly, *Ernst & Ernst* expressly recognized that the language of Rule 10b-5, in isolation, "could be read as proscribing . . . any type of material misstatement or omission . . . that has the effect of defrauding investors, *whether the wrongdoing was intentional or not*." *Id.* at 212 (emphasis added). Nevertheless, the Court determined that the specific language of the authorizing statute necessarily cabins the sweep of the rule, so that a showing of scienter is required to establish a violation of Rule 10b-5. *Id.* at 212–14.

In 1980 the Supreme Court explained that Congress sometimes required different levels of culpability within a single securities statute. *Aaron v. Securities & Exchange Commission* addressed the level of culpability required by § 17(a) of the Securities Act of 1933, a statutory provision containing language nearly identical to the statute at issue in this case, § 14(e). 446 U.S. 680, 682 (1980). *Aaron* examined the text of § 17(a) and noted that only § 17(a)(1) includes the terms "device," "scheme," and "artifice":

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> > (1) to employ any device, scheme, or artifice to defraud, or
> >
> > (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements . . ., in light of the circumstances under

> which they were made, not misleading
> . . . .

15 U.S.C. § 77q(a)(1)–(2) (emphasis added).  Citing *Ernst & Ernst*, the *Aaron* Court explained that "device," "scheme," and "artifice" "all connote knowing or intentional practices," in sharp contrast to the language of § 17(a)(2), "which prohibits any person from obtaining money or property 'by means of any untrue statement [or omission] of a material fact.'"  *Aaron*, 446 U.S. at 696.  Because § 17(a)(2) is "devoid of any suggestion whatsoever of a scienter requirement," *id.*, the Court held that § 17(a)(1) requires scienter, and that § 17(a)(2) does not.  *Id.* at 697.

*Ernst & Ernst* and *Aaron* are both critical to the decision we issue today.  *Ernst & Ernst* explains that where Congress prohibited "fraudulent" or "deceptive" practices—as in the second clause of § 14(e)—a heightened showing of culpability is required.  Where Congress used language banning untrue statements of material fact (or the omission of a material fact necessary to make a statement not misleading), a lesser showing of culpability will suffice.  With the holding of *Ernst & Ernst* in mind, the words Congress used in § 14(e) are illuminating:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, *or to engage in any fraudulent, deceptive, or manipulative acts or practices*, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition

to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e) (emphasis added). Only the second clause of § 14(e) contemplates a scienter requirement; Congress did not use the words signaling a heightened standard of culpability in the first clause of the statute.[2]

*Aaron* is important to today's decision because it reminds us that when Congress uses a disjunctive, a single statutory provision can call for more than one level of scienter. The similarities between the statute discussed in *Aaron*, § 17(a), and the statute at issue here, § 14(e), are striking: both statutes include distinct clauses separated by a disjunctive "or," with one clause containing terms that plainly proscribe more culpable conduct by using terms like "fraudulent," "deceptive," "device," or "artifice." And both statutes have a separate clause more expansively prohibiting "untrue statement[s] of a material fact." *See* 15 U.S.C. §§ 77q(a), 78n(3). Because *Aaron* held that § 17(a)'s two clauses require different degrees of culpability, it strongly suggests the same is true of the two very different clauses in § 14(e).

---

[2] This reading of § 14(e) is consistent with the Supreme Court's separate instruction that the scope of conduct that may be regulated under § 14(e) is broader than that under § 10(b). *See United States v. O'Hagan*, 521 U.S. 642 (1997) (holding that under § 14(e), the SEC may prohibit "acts not themselves fraudulent under the common law or § 10(b), if the prohibition is reasonably designed to prevent acts and practices that are fraudulent" (internal quotation marks and alteration omitted)). Our court, too, has recognized that § 14(e) authorizes the SEC to promulgate rules "that prohibit acts not themselves fraudulent," which is "a power that has no parallel in Section 10(b)." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1005 (9th Cir. 2002).

Some circuits continue to rule that § 14(e) requires scienter in the wake of *Ernst & Ernst* and *Aaron*, but in doing so they have maintained their reliance on pre-*Ernst & Ernst* and pre-*Aaron* circuit case law. *See Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961 (2d Cir. 1987) (citing *Chris-Craft* for the proposition that "[i]t is well settled in this Circuit that scienter is a necessary element of a claim for damages under § 14(e) of the Williams Act"); *In re Digital Island Sec. Litig.*, 357 F.3d 322, 328 (3d Cir. 2004) (citing *Connecticut National Bank* and *Smallwood* to hold "[w]e . . . join those circuits that hold that scienter is an element of a Section 14(e) claim"); *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citing *Smallwood* for the proposition that "[t]he elements of a claim under Section 14(e), which applies to tender offers, are identical to the Section 10(b)/Rule 10b-5 elements").

We cannot be sure how other circuits would rule were they to revisit § 14(e) in light of *Ernst & Ernst* and *Aaron*, but I question the continuing viability of the foundation for *Chris-Craft* and the cases that followed it.[3] I am persuaded that the decision we issue today is most consistent with the Supreme Court's decisions in *Ernst & Ernst* and *Aaron*.

---

[3] *Chris-Craft* held that § 14(e) requires scienter because the identical language in Rule 10b-5 requires scienter. *Chris-Craft Indust., Inc.*, 480 F.2d at 362. But the earlier case that *Chris-Craft* cited for the proposition that Rule 10b-5 requires more than negligence concluded that Rule 10b-5 regulates "a standard of conduct that encompasses *negligence* as well as active fraud." *Sec. and Exchange Comm'n v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 855 (2d Cir. 1968) (emphasis added).